587 So.2d 427 (1990)
Charles Wayne GORDON
v.
STATE.
8 Div. 496.
Court of Criminal Appeals of Alabama.
May 25, 1990.
Rehearing Denied June 29, 1990.
*428 Joe N. Lampley, Huntsville, for appellant.
Don Siegelman, Atty. Gen., and Rosa Hamlett Davis, Asst. Atty. Gen., for appellee.
TAYLOR, Presiding Judge.
The appellant, Charles Wayne Gordon, was convicted of capital murder, as defined by § 13A-5-40(a)(7), Code of Alabama 1975, and was convicted of assault, a violation of § 13A-6-20 Code of Alabama 1975. He was sentenced to life without parole on the murder conviction and to 20 years' imprisonment on the assault conviction.
The state's evidence tended to show that on April 22, 1988, the appellant's mother, Mary E. Gordon, was stabbed to death by a friend of the appellant. Upon her returning home on April 22, David Eickholt was waiting for her with a knife. David lunged at her, stabbing her at least 10 times; three of the wounds could have caused her death.
Mr. Embry, a neighbor of the victim, saw Ms. Gordon walk to her apartment and shortly thereafter heard screams. He ran to her apartment and saw David Eickholt standing over her body with a knife. When David saw Mr. Embry, he stabbed him, dropped the knife, and ran.
Evidence established that the appellant and David had planned for several weeks to kill Ms. Gordon, so that the appellant would inherit her money. David testified that the appellant told him that his mother had cancer and was going to die anyway. David said the appellant played on his sympathy. The appellant and David discussed the best way to kill Ms. Gordon. They finally came up with a plan. The appellant would give David a key to her apartment and David would wait for her behind the door with a knife, taken from her kitchen. A knife would be used because it was quieter than a gun. On April 22, 1988, their plans were carried out. Shortly thereafter, appellant was arrested and charged with capital murder in the death of his mother.

I
The appellant, a white male, first contends that the trial court erred in allowing the State to use its peremptory challenges to remove 6 of the 7 black veniremen from the jury panel. Appellant, citing the decision in Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), argues that this was a discriminatory exclusion of black jurors, and as such, violates the Equal Protection Clause of the United States Constitution. Appellant further argues that the recent decision in Holland v. Illinois, 493 U.S. 474, 110 S.Ct. 803, 107 L.Ed.2d 905 (1990), supports his position.
Under Batson and numerous Alabama decisions following Batson, a defendant, in order to establish a prima facie Equal Protection Clause violation, "must show that he is a member of a cognizable racial group... and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race." Batson, 476 U.S. at 96, 106 S.Ct. at 1723. See also e.g., Turner v. State, 521 So.2d 93 (Ala.Cr.App.1987); Swain v. State, 504 So.2d 347 (Ala.Cr.App.1986). As a white male, the appellant is not a member of the race excluded from jury service. As this Court stated in Bankhead v. State, 585 So.2d 97 (Ala.Cr.App.1989), "the rule of Batson does not apply in cases where black veniremen are removed from the jury of a white defendant." 585 So.2d at 101, quoting Smith v. State, 515 So.2d 149, 150 (Ala.Cr.App.1987). See also Bui v. State, 551 So.2d 1094 (Ala.Cr.App.1988), aff'd, 551 So.2d 1125 (Ala.1989).
We would further note that appellant's reliance on Holland v. Illinois is misplaced. In Holland, the Supreme Court stated:
"In Batson v. Kentucky, 476 U.S. 79, 96 [106 S.Ct. 1712, 1723, 90 L.Ed.2d 69] (1986), we said that to establish a prima facie Equal Protection Clause violation in the discriminatory exclusion of petit jurors, the defendant `must show that he is a member of a cognizable racial group... and that the prosecutor has exercised peremptory challenges to remove from *429 the venire members of the defendant's race' (emphasis added [in Holland]). We have never suggested, however, that such a requirement of correlation between the group identification of the defendant and the group identification of excluded venire members is necessary for Sixth Amendment standing.... Of course, in this case petitioner seeks an extension of the fair cross-section requirement from the venire to the petit jurybut that variation calls into question the scope of the Sixth Amendment guarantee, not his standing to assert it."
493 U.S. at 476-77, 110 S.Ct. at 805.
As can be seen from the excerpt above, the decision in Holland centers on whether a defendant has a right to a petit jury composed of a fair cross-section of the community. In Holland, the Supreme Court rejected the petitioner's claim, determining that the constitutional goal of "an impartial jury" would be obstructed by a petit jury fair cross-section requirement. 493 U.S. at 482-85, 110 S.Ct. at 808-09. Moreover, as stated by Justice Kennedy in his concurrence, "this case does not resolve the question whether a defendant of a race different than that of the juror may challenge the race-motivated exclusion of jurors under the constitutional principles that underpin Batson." 493 U.S. at 488, 110 S.Ct. at 811. Until such time as the Supreme Court chooses to address this issue, we see no need to alter our previous position on this issue.

II
Appellant next argues that the trial judge committed reversible error when he recharged the jury on the term "pursuant to a contract." After the jury had begun its deliberations, it returned with a request for the trial judge, for further instructions. In the jury's words, "We need a reiteration of the legal definition or the explanation of `pursuant to a contract.'"
The trial court gave the following reinstruction:
"THE COURT: I told you that `pursuant to' means a following after or a following out of a contract. It means by reason of a contract or in accordance with the contract, or done in consequence of or in carrying out a contract. That's what pursuant to means. It means to carry out the contract, by reason of the contract or doing something in accordance with the contract. Then I told you that contract is the term that we don't often use in criminal law. It's a civil law term, really. It's a binding agreement between parties in civil law.
"[DEFENSE ATTORNEY]: Your Honor, may I approach the bench?
"THE COURT: Mr. Lampley, you have a seat. When I get through, you can make an exception.
"I told you that in civil law a contract ordinarily is a binding agreement between parties. It is an agreement between two or more parties to do or to refrain from doing some particular act. It is an agreement to do something. I also told you that there are basically four elements to a contract in civil law. That's an agreement between the parties based on a valuable consideration and based on a lawful object, and that there is a meeting of the minds to what the contract is, that is, everybody understands the terms and conditions of the contract. But when we are talking about pursuant to a contract in criminal law there is no such thing as a legally binding enforceable criminal contract because the law won't enforce a contract that has to do with something that is illegal. If the object of it is unlawful, then it's not a binding contract. So that's not what the legislature is talking about when we are talking about pursuant to a contract. They are not talking about a legally binding contract as we talk about in civil law. What they are talking about is an agreement between two people to do or to refrain from doing some particular act. When you think of it, you are thinking about one party agreeing to do some act or acts in exchange for some consideration or some benefit from the other party. But, basically, it is just an agreement. It's a promise made by one party in exchange for promise or some act or some conduct by the other party.

*430 "I went on to state to you that in this case the State has set out the allegation in the indictment of what they say the contract was, what the agreement was between these parties. The State is contending in this indictment that the killing of Mary Gordon was done pursuant to this contract that's in this indictment, that in the carrying out of this contract that is why she was killed. She was killed pursuant to this contract. In the indictment it is charged that the contract was a promise by Charles Wayne Gordon, a promise by Charles Wayne Gordon [sic] to David Eickholt, that Charles Gordon would provide the use of an automobile, expenses for education, and an indefinite amount of pecuniary remuneration in the future in exchange for the acts of David Eickholt in intentionally causing the death of Mary Gordon by cutting and stabbing her with a knife. Now, the State has the burden to prove to each of you beyond a reasonable doubt that the killing of Mary E. Gordonthat there was a murder of Mary E. Gordon done pursuant to that agreement, that in the carrying out of that agreement she was killed, that she was murdered, and murder meaning that with intent to cause her death she was killed by cutting and stabbing with a knife.
"I told you that the four elements that the State had to prove beyond a reasonable doubt is that this defendant had this specific intent to cause her death, that with intent to promote or assist in causing her death he procured, induced or caused David Eickholt to intentionally kill her, or he aided and abetted David Eickholt to intentionally kill her, or both. Third, that she was intentionally killed by David Eickholt, that it was his purpose to kill her, that she was intentionally killed by David Eickholt by being cut and stabbed with a knife, and that that occurred, all that occurred, pursuant or in the carrying out of this contract that they put in the indictment, that Charles Wayne Gordon would provide the use of an automobile, expenses for education and an indefinite amount of money in the future in exchange for David Eickholt intentionally murdering Mary E. Gordon.
"You may retire to the jury room, but do not resume your deliberations until I send you word. Just step back in the jury room for just a moment."
At the conclusion of the court's reinstruction to the jury, defense counsel objected on the grounds that the reinstruction went outside the specific question asked by the jury. "It is clearly the law that the jury `at all times has access to the trial court for legal instruction.' Tillison v. State, 32 Ala.App. 397, 398, 27 So.2d 41, 42 [cert. denied, 248 Ala. 196, 27 So.2d 46 (1946) ]." Ebens v. State, 518 So.2d 1264, 1268 (Ala.Cr.App.1986). Moreover, we note the following: in United States v. Zabic, 745 F.2d 464 (7th Cir.1984):
"Once questions arose among the jurors concerning the original instructions, `[t]he trial court [had to] exercise its sound discretion in determining what type of supplementary instructions should be given to a deliberating jury that seeks clarification of the law.' (citation omitted). The trial court judge was required to respond to the jurors' questions with `concrete accuracy' (citation omitted), and thus `clarify the jurors' points of concern.'" Zabic, 745 F.2d at 475.
As this Court has stated when dealing with supplemental instructions on questions specifically asked by jurors, "`it is the recommended practice for the trial court to remain within such area.'" Thomas v. State, 455 So.2d 278, 281 (Ala. Cr.App.1984).
It is clear from the reinstruction that the trial court remained within the area requested by the jury. No error occurred here.

III
Appellant further argues that the prosecutor erred in referring in his closing argument to statements made by the appellant and his co-defendant that were not admitted into evidence. Appellant cites several instances in which the prosecutor *431 made reference to unadmitted evidence. They are as follows:
"[PROSECUTING ATTORNEY]: You heard that yesterday afternoon in this defendant's own bird's eye view concerning their relationship. [sic] Also David Eickholt, the statement, as I recall, the taped statement that was read to you yesterday, or played to you yesterday, where Chuck was testifying in that second interview that started at 9:18 a.m. on the 23rd. We are talking about the call that he made to David. He said, `Are you going to do it tomorrow?' He said, `Well, how?' He said, `Well, I've got to work 10:00 `til 7:00.' Then he said, `Sure.' And I laughed and he said, `You don't think I'm going to do it.' This is Chuck speaking now. He said, `We'll see.' And I sort of prodded him like you ain't going to do it, and I called him yesterday morning at 9:20 and he was at home and I spoke to him. I asked him if he was going to do it and he said yes. He had to get up and go to school. As I recall the evidence, he said, `I went to work and I got off for lunch, went home for lunch, made myself a sandwich and went to the bathroom and my mother called, and I had just called David. I was talking to David when she called and we talked for a couple of minutes.' You know, he said he had call waiting. So the call to David was interrupted. `I was talking to David when she called and we talked for a couple of minutes.'
"[DEFENSE COUNSEL]: We object to reading the statement. It was not admitted into evidence.
"THE COURT: Overruled.
"[PROSECUTING ATTORNEY]: This is my recollection of the taped statement. We talked for a couple of minutes. That was the last time I spoke to her. I told her I loved her and then I flipped back over and David said, `Was that your mom?' And I said, `Yes.' He said, `I guess you told her you loved her.' I said, `Yes.' And he laughed and he said, `I can't believe you.'
"[DEFENSE COUNSEL]: We object to the reading of the statement, reading from David Eickholt's statement. That statement was never admitted into evidence, nor was the tape played.
"[PROSECUTING ATTORNEY]: This is Chuck Gordon's statement. This is my recollection of the tape.
"THE COURT: I will overrule. It will be for the jury to decide.
"....
"[PROSECUTING ATTORNEY]: David's testimony from the stand, when we read from his written statement that he made, the next day'At first he brought up the subject as a joke or just kidding. After a couple of days during the second week of the four weeks he brought up the subject again and he sounded serious.'
"[DEFENSE COUNSEL]: Your Honor, I object to counsel reading from David Eickholt's statement. It was offered into evidence, but the Court refused to accept it.
"[PROSECUTING ATTORNEY]: Judge, he read this from the stand, David Eickholt did, in his testimony.
"THE COURT: Overruled. It will be for the jury to decide.
"....
"[PROSECUTING ATTORNEY]: As I recall from the tape yesterday that was played of Chuck's statement at 9:18 in the morning of the 23rd, in response to Harry's questions
"[DEFENSE COUNSEL]: Your Honor, we object again to counsel reading from the transcribed statement of Mr. Gordon. The transcribed statement has never been introduced into evidence.
"[THE COURT]: It will be for the jury to decide.
"....
"[PROSECUTING ATTORNEY]: In the taped interview you heard of Chuck yesterday. Chuck was talking to Harry and Investigator Renfroe said, `What was the bag for?' Chuck said, `To carry off the purse without being noticeable or anything else he took, and going to the apartment,' etc.

*432 "[DEFENSE COUNSEL]: Same objection, Your Honor, reading from the transcribed statement.
"THE COURT: Overruled.
"....
"[PROSECUTING ATTORNEY]: As I recall, when the taped statement of this defendant was played yesterday Harry asked Chuck
"[DEFENSE COUNSEL]: I make the same objection, Your Honor. He is going to read from the transcribed statement of the tape."
Directly following the last instance, the judge admonished the jury as follows:
"THE COURT: Ladies and gentlemen, let me just say something at this point. What the attorneys say to you in closing statements is not evidence in the case. It is their version of the evidence. Your decision in the case is based on what you heard from the witness stand, what you heard from the tape-recorded statement, not what he is saying or reading to you off of this. You rely upon your recollection, but I have to permit the attorneys to make closing statements to you and in doing that they are allowed to use evidence or to comment on the evidence that was presented, and they are allowed to draw reasonable inferences from the evidence and to state what they recall the evidence was. I am permitting that, but I am telling you that what he is saying to you, what Mr. Morgan is saying to you, is not evidence in the case. You use your recollection of what you heard on the tape-recorded statement, if that is what he is referring to, as the evidence in the case, not what he says to you. With that admonition, I overrule your objection."
We recently wrote the following in Bankhead v. State, supra:
"Questions of the propriety of argument of counsel are largely within the trial court's discretion, McCullough v. State, 357 So.2d 397, 399 (Ala.Cr.App. 1978), and that court is given broad discretion in determining what is permissible argument. Hurst v. State, 397 So.2d 203, 208 (Ala.Cr.App.), cert. denied, 397 So.2d 208 (Ala.1981). Moreover, this Court has stated that it will not reverse unless there has been an abuse of that discretion. Miller v. State, 431 So.2d 586, 591 (Ala.Cr.App.1983)."
Bankhead, 585 So.2d at 105.
"A trial judge is in the best position to determine whether the prejudicial effects of an improper comment can be eradicated by instructions to the jury." Petite v. State, 520 So.2d 207, 210 (Ala.Cr.App.1987). "The test of a prosecutor's legitimate argument is that whatever is based on facts in evidence is within the scope of proper comment in argument." Watson v. State, 398 So.2d 320, 329 (Ala.Cr.App.1980), writ denied, 398 So.2d 332 (Ala.), cert. denied, 452 U.S. 941, 101 S.Ct. 3085, 69 L.Ed.2d 955 (1981).
In the instant case, a tape recording of the statement made by the appellant was played to the jury. As the prosecutor stated in all but one instance, his comments to the jury were based on his recollection of the evidence and statements read by David Eickholt into evidence. This is permissible. Moreover, the trial court thoroughly instructed the jury that comments made by either attorney were not to be considered as evidence. The trial court further instructed the jury that the only evidence which could be considered was that which was testified to on the witness stand and items which were admitted into evidence. Accordingly, no error occurred in this instance.

IV
Appellant next argues that the trial court erred in failing to charge the jury "as to the law that `he that can inherit from another (testate or intestate), but causes the death of the same person, forfeits his inheritance.'"
There is no evidence in the record that the appellant knew this was the law prior to his mother's murder. "A trial court has broad discretion in formulating its jury instructions." Coon v. State, 494 So.2d 184, 186 (Ala.Cr.App.1986). Charges which are "inapplicable or abstract" are correctly denied. *433 See McDaniel v. State, 446 So.2d 670, 674 (Ala.Cr.App.1983).
This charge was not supported by the evidence; thus the trial court did not abuse its discretion in denying it.

V
Last, appellant argues that there was a break in the chain of custody of the body; therefore, he argues, any evidence concerning the body would be inadmissible.
"The purpose of establishing a chain of custody is to show a reasonable probability that there has been no tampering with the item of evidence. Bell v. State, 339 So.2d 96 (Ala.Crim.App.1976). In passing upon the admissibility of such evidence, `the trial judge should consider the nature of the article and the circumstances surrounding its preservation and custody,' and permit its introduction where continuity of possession is `sufficiently established to afford ample assurances of ... authenticity.'"
Oliver v. State, 479 So.2d 1385, 1390 (Ala. Cr.App.1985) (citation omitted).
"[I]t is not necessary to prove to an absolute certainty, but only to a reasonable probability, that the object is the same as, and not substantially different from, the object at the commencement of the chain." Grice v. State, 481 So.2d 449, 451 (Ala.Cr. App.1985). "It is not necessary that a perfect strong and unbroken chain of possession be proved to an absolute certainty. [Citation omitted.] Evidence has been held correctly admitted even when the chain of custody has a weak or missing link." Shute v. State, 469 So.2d 670, 674 (Ala.Cr. App.1984). A weak link goes to credibility, not to admissibility. Grice, 481 So.2d at 451. "The state does not have to negate the remotest possibility of alteration, substitution, or tampering with the evidence." Shute, 469 So.2d at 674.
The evidence established that Paramedic Louis White transported the body to Huntsville Hospital on April 22, 1988. Her wounds were left undisturbed. The next morning Benny Wright, from the Department of Forensic Sciences, transported the body to the Forensic Sciences facility in Huntsville. At approximately 12:15 on the morning of April 23, Bruce Sparling picked up the body and delivered it to one of Dr. Warner's assistants at the Department of Forensic Sciences pathology laboratory in Tuscaloosa at 3:00 p.m. that same day. Dr. Warner performed the autopsy at approximately 3:30 p.m. on April 23, 1988.
This court dealt with the issue of a sufficient chain of custody of a corpse in Bridges v. State, 516 So.2d 895 (Ala.Cr. App.1987). In Bridges, the ambulance driver was unable to identify the hospital employee that he relinquished the body to. This court still found that the testimony established a sufficient chain of custody.
There was no evidence in this case that the body had been tampered with in any way. A sufficient chain of custody was therefore established. No error occurred in this instance.
For the foregoing reasons, this case is due to be, and it is hereby, affirmed.
AFFIRMED.
All the Judges concur, except BOWEN, J., who dissents with opinion.
BOWEN, Judge, dissenting.
I dissent from Part I of the opinion wherein the majority concludes that a white defendant has no standing to object to and contest the prosecutor's removal of a black veniremember for racial reasons. In my opinion, a white defendant has standing to raise this issue under the constitutions of both the United States and the State of Alabama.
In Holland v. Illinois, 493 U.S. 474, 110 S.Ct. 803, 107 L.Ed.2d 905 (1990), the United States Supreme Court held that the racial exclusion of black veniremembers from the jury does not violate the Sixth Amendment to the United States Constitution. In a dissenting opinion, Justice Marshall, joined by Justices Brennan and Blackmun, wrote:
"As a majority of this Court has now concluded, a close reading of Batson shows that a defendant's race is irrelevant to his standing to raise the equal *434 protection claim recognized in that case. See infra, [110 S.Ct.] at 813-814 (MARSHALL, J., dissenting); ante, at 811-812 (KENNEDY, J., concurring); post, at 820-822 (STEVENS, J., dissenting).... Nowhere did the Court state [in Batson], however, that a white defendant could not make out a prima facie case based upon the exclusion of Afro-American jurors, and the logic of the Court's decision would not have supported such a conclusion.
"* * * *
"In any event, the question whether a defendant's race affects his standing to invoke Batson is one on which the Court has not ruled. For the reader who seeks guidance on how the Court would rule if the issue were presented and argued, the agreement of five Justices [Blackmun, Brennan, Kennedy, Marshall, and Stevens] that a defendant's race is irrelevant to the Fourteenth Amendment standing inquiry is far more illuminating than the majority's veiled intimations and cryptic turns of phrase."

Holland, 493 U.S. at 491-92, 110 S.Ct. at 813-814 (emphasis added).
Furthermore, in my opinion, the conclusion is inescapable that the Constitution and statutes of Alabama require such a result even if the Constitution of the United States does not. Article I, section 6, of the Alabama Constitution of 1901 gives the criminal defendant the right to "an impartial jury." Under § 11, "the right of trial by jury shall remain inviolate."
Ala.Code 1975, § 12-16-55, states:
"It is the policy of this state that all persons selected for jury service be selected at random from a fair cross section of the population of the area served by the court, and that all qualified citizens have the opportunity, in accordance with this article, to be considered for jury service in this state and an obligation to serve as jurors when summoned for that purpose."
Ala.Code 1975, § 12-16-56, specifically prohibits discrimination in the selection of jurors.
"A citizen shall not be excluded from jury service in this state on account of race, color, religion, sex, national origin or economic status."
It is inconceivable to me, that, in this day and age, any court can either sanction racial discrimination or ignore the allegation of racial discrimination on the basis of the race of the complaining party. For that reason, I dissent from the opinion of the majority.